(Slip Opinion) OCTOBER TERM, 2023 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GARLAND, ATTORNEY GENERAL, ET AL. *v.* CARGILL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 22–976.  Argued February 28, 2024—Decided June 14, 2024

The National Firearms Act of 1934 defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U. S. C. §5845(b). With a machinegun, a shooter can fire multiple times, or even continuously, by engaging the trigger only once. This capability distinguishes a machinegun from a semiautomatic firearm. With a semiautomatic firearm, the shooter can fire only one time by engaging the trigger. Using a technique called bump firing, shooters can fire semiautomatic firearms at rates approaching those of some machineguns. A shooter who bump fires a rifle uses the firearm's recoil to help rapidly manipulate the trigger. Although bump firing does not require any additional equipment, a "bump stock" is an accessory designed to make the technique easier. A bump stock does not alter the basic mechanics of bump firing, and the trigger still must be released and reengaged to fire each additional shot.

For many years, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) consistently took the position that semiautomatic rifles equipped with bump stocks were not machineguns under §5845(b). ATF abruptly changed course when a gunman using semiautomatic rifles equipped with bump stocks fired hundreds of rounds into a crowd in Las Vegas, Nevada, killing 58 people and wounding over 500 more. ATF subsequently proposed a rule that would repudiate its previous guidance and amend its regulations to "clarify" that bump stocks are machineguns. 83 Fed. Reg. 13442. ATF's Rule ordered owners of bump stocks either to destroy or surrender them to ATF to avoid criminal prosecution.

Michael Cargill surrendered two bump stocks to ATF under protest,

then filed suit to challenge the Rule under the Administrative Procedure Act. As relevant, Cargill alleged that ATF lacked statutory authority to promulgate the Rule because bump stocks are not "machinegun[s]" as defined in §5845(b). After a bench trial, the District Court entered judgment for ATF. The Fifth Circuit initially affirmed, but reversed after rehearing en banc. A majority agreed that §5845(b) is ambiguous as to whether a semiautomatic rifle equipped with a bump stock fits the statutory definition of a machinegun and resolved that ambiguity in Cargill's favor.

*Held*: ATF exceeded its statutory authority by issuing a Rule that classifies a bump stock as a "machinegun" under §5845(b). Pp. 6–19.

(a) A semiautomatic rifle equipped with a bump stock is not a "machinegun" as defined by §5845(b) because: (1) it cannot fire more than one shot "by a single function of the trigger" and (2) even if it could, it would not do so "automatically." ATF therefore exceeded its statutory authority by issuing a Rule that classifies bump stocks as machineguns. P. 6.

(b) A semiautomatic rifle equipped with a bump stock does not fire more than one shot "by a single function of the trigger." The phrase "function of the trigger" refers to the mode of action by which the trigger activates the firing mechanism. No one disputes that a semiautomatic rifle without a bump stock is not a machinegun because a shooter must release and reset the trigger between every shot. And, any subsequent shot fired after the trigger has been released and reset is the result of a separate and distinct "function of the trigger." Nothing changes when a semiautomatic rifle is equipped with a bump stock. Between every shot, the shooter must release pressure from the trigger and allow it to reset before reengaging the trigger for another shot. A bump stock merely reduces the amount of time that elapses between separate "functions" of the trigger.

ATF argues that a shooter using a bump stock must pull the trigger only one time to initiate a bump-firing sequence of multiple shots. This initial trigger pull sets off a sequence—fire, recoil, bump, fire—that allows the weapon to continue firing without additional physical manipulation of the trigger by the shooter. This argument rests on the mistaken premise that there is a difference between the shooter flexing his finger to pull the trigger and pushing the firearm forward to bump the trigger against his stationary finger. Moreover, ATF's position is logically inconsistent because its reasoning would also mean that a semiautomatic rifle *without* a bump stock is capable of firing more than one shot by a "single function of the trigger." Yet, ATF agrees that is not the case. ATF's argument is thus at odds with itself. Pp. 7–14.

(c) Even if a semiautomatic rifle with a bump stock could fire more

than one shot "by a single function of the trigger," it would not do so "automatically." Section 5845(b) specifies the precise action that must "automatically" cause a weapon to fire "more than one shot"—a "single function of the trigger." If something more than a "single function of the trigger" is required to fire multiple shots, the weapon does not satisfy the statutory definition. Firing multiple shots using a semiautomatic rifle with a bump stock requires more than a single function of the trigger. A shooter must maintain forward pressure on the rifle's front grip with his nontrigger hand. Without this ongoing manual input, a semiautomatic rifle with a bump stock will not fire multiple shots.

ATF counters that machineguns also require continuous manual input from a shooter: The shooter must both engage the trigger and keep it pressed down to continue shooting. ATF argues there is no meaningful difference between holding down the trigger of a traditional machinegun and maintaining forward pressure on the front grip of a semiautomatic rifle with a bump stock. This argument ignores that Congress defined a machinegun by what happens "automatically" "by a single function of the trigger." Simply pressing and holding the trigger down on a fully automatic rifle is not manual input in addition to a trigger's function. By contrast, pushing forward on the front grip of a semiautomatic rifle equipped with a bump stock is not part of functioning the trigger.

Moreover, a semiautomatic rifle with a bump stock is indistinguishable from the Ithaca Model 37 shotgun, a weapon the ATF concedes cannot fire multiple shots "automatically." ATF responds that a shooter is less physically involved with operating a bump-stock equipped rifle than operating the Model 37. It explains that once a shooter pulls the rifle's trigger a single time, the bump stock harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing. But, even if one aspect of a weapon's operation could be seen as "automatic," that would not mean the weapon "shoots . . . automatically more than one shot . . . *by a single function of the trigger*." §5845(b) (emphasis added). Pp. 14–17.

(d) Abandoning the text, ATF attempts to shore up its position by relying on the presumption against ineffectiveness. That presumption weighs against interpretations of a statute that would "rende[r] the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner." *The Emily*, 9 Wheat. 381, 389. In ATF's view, Congress "restricted machineguns because they eliminate the manual movements that a shooter would otherwise need to make in order to fire continuously" at a high rate of fire, as bump stocks do. Brief for Petitioners 40. So, ATF reasons, concluding that bump stocks

are lawful "simply because the [trigger] moves back and forth . . . would exalt artifice above reality and enable evasion of the federal machinegun ban." *Id.*, at 41–42. The presumption against ineffectiveness cannot do the work that ATF asks of it. Interpreting §5845(b) to exclude semiautomatic rifles equipped with bump stocks comes nowhere close to making the statute useless. Pp. 17–19.

57 F. 4th 447, affirmed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. ALITO, J., filed a concurring opinion. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 22–976

———

## MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* MICHAEL CARGILL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 14, 2024]

JUSTICE THOMAS delivered the opinion of the Court.

Congress has long restricted access to "'machinegun[s],'" a category of firearms defined by the ability to "shoot, automatically more than one shot . . . by a single function of the trigger." 26 U. S. C. §5845(b); see also 18 U. S. C. §922(*o*). Semiautomatic firearms, which require shooters to reengage the trigger for every shot, are not machineguns. This case asks whether a bump stock—an accessory for a semiautomatic rifle that allows the shooter to rapidly reengage the trigger (and therefore achieve a high rate of fire)—converts the rifle into a "machinegun." We hold that it does not and therefore affirm.

I

A

Under the National Firearms Act of 1934, a "machinegun" is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." §5845(b). The statutory definition also includes "any part designed and intended . . . for use in

converting a weapon into a machinegun." *Ibid.* With a machinegun, a shooter can fire multiple times, or even continuously, by engaging the trigger only once. This capability distinguishes a machinegun from a semiautomatic firearm. With a semiautomatic firearm, the shooter can fire only one time by engaging the trigger. The shooter must release and reengage the trigger to fire another shot. Machineguns can ordinarily achieve higher rates of fire than semiautomatic firearms because the shooter does not need to release and reengage the trigger between shots.

Shooters have devised techniques for firing semiautomatic firearms at rates approaching those of some machineguns. One technique is called bump firing. A shooter who bump fires a rifle uses the firearm's recoil to help rapidly manipulate the trigger. The shooter allows the recoil from one shot to push the whole firearm backward. As the rifle slides back and away from the shooter's stationary trigger finger, the trigger is released and reset for the next shot. Simultaneously, the shooter uses his nontrigger hand to maintain forward pressure on the rifle's front grip. The forward pressure counteracts the recoil and causes the firearm (and thus the trigger) to move forward and "bump" into the shooter's trigger finger. This bump reengages the trigger and causes another shot to fire, and so on.

Bump firing is a balancing act. The shooter must maintain enough forward pressure to ensure that he will bump the trigger with sufficient force to engage it. But, if the shooter applies too much forward pressure, the rifle will not slide back far enough to allow the trigger to reset. The right balance produces a reciprocating motion that permits the shooter to repeatedly engage and release the trigger in rapid succession.

Although bump firing does not require any additional

equipment, there are accessories designed to make the technique easier. A "bump stock" is one such accessory.[1] It replaces a semiautomatic rifle's stock (the back part of the rifle that rests against the shooter's shoulder) with a plastic casing that allows every other part of the rifle to slide back and forth. This casing helps manage the back-and-forth motion required for bump firing. A bump stock also has a ledge to keep the shooter's trigger finger stationary. A bump stock does not alter the basic mechanics of bump firing. As with any semiautomatic firearm, the trigger still must be released and reengaged to fire each additional shot.

B

The question in this case is whether a bump stock transforms a semiautomatic rifle into a "machinegun," as defined by §5845(b). For many years, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) took the position that semiautomatic rifles equipped with bump stocks were not machineguns under the statute. On more than 10 separate occasions over several administrations, ATF consistently concluded that rifles equipped with bump stocks cannot "automatically" fire more than one shot "by a single function of the trigger." See App. 16–68. In April 2017, for example, ATF explained that a rifle equipped with a bump stock does not "operat[e] automatically" because "forward pressure must be applied with the support hand to the forward handguard." *Id.,* at 66. And, because the shooter slides the rifle forward in the stock "to fire each shot, each succeeding shot fir[es] with a single trigger function." *Id.,* at 67.

ATF abruptly reversed course in response to a mass shooting in Las Vegas, Nevada. In October 2017, a gunman

_____

[1] Some bump stocks (called mechanical bump stocks) rely on an internal spring, rather than forward pressure from the shooter's nontrigger hand, to force the rifle and trigger forward after recoil. These devices are not at issue in this case.

fired on a crowd attending an outdoor music festival in Las Vegas, killing 58 people and wounding over 500 more. The gunman equipped his weapons with bump stocks, which allowed him to fire hundreds of rounds in a matter of minutes.

This tragedy created tremendous political pressure to outlaw bump stocks nationwide. Within days, Members of Congress proposed bills to ban bump stocks and other devices "designed . . . to accelerate the rate of fire of a semiautomatic rifle." S. 1916, 115th Cong., 1st Sess., §2 (2017); see also H. R. 3947, 115th Cong., 1st Sess. (2017); H. R. 3999, 115th Cong., 1st Sess. (2017). None of these bills became law. Similar proposals in the intervening years have also stalled. See, *e.g.*, H. R. 396, 118th Cong., 1st Sess. (2023); S. 1909, 118th Cong., 1st Sess. (2023); H. R. 5427, 117th Cong., 1st Sess. (2021).

While the first wave of bills was pending, ATF began considering whether to reinterpret §5845(b)'s definition of "machinegun" to include bump stocks. It proposed a rule that would amend its regulations to "clarify" that bump stocks are machineguns. 83 Fed. Reg. 13442 (2018). ATF's about-face drew criticism from some observers, including those who agreed that bump stocks should be banned. Senator Dianne Feinstein, for example, warned that ATF lacked statutory authority to prohibit bump stocks, explaining that the proposed regulation "'hinge[d] on a dubious analysis'" and that the "'gun lobby and manufacturers [would] have a field day with [ATF's] reasoning'" in court. Statement on Regulation To Ban Bump Stocks (Mar. 23, 2018). She asserted that "'legislation is the only way to ban bump stocks.'" *Ibid.*

ATF issued its final Rule in 2018. 83 Fed. Reg. 66514. The agency's earlier regulations simply restated §5845(b)'s statutory definition. *Ibid.* The final Rule amended those regulations by adding the following language:

> "[T]he term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and 'single function of the trigger' means a single pull of the trigger and analogous motions. The term 'machinegun' includes a bump-stock-type device, *i.e.*, a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter." *Id.*, at 66553–66554.

The final Rule also repudiated ATF's previous guidance that bump stocks did not qualify as "machineguns" under §5845(b). *Id.*, at 66530–66531. And, it ordered owners of bump stocks to destroy them or surrender them to ATF within 90 days. *Id.*, at 66530. Bump-stock owners who failed to comply would be subject to criminal prosecution. *Id.*, at 66525; see also 18 U. S. C. §922(*o*)(1).

## C

Michael Cargill surrendered two bump stocks to ATF under protest. He then filed suit to challenge the final Rule, asserting a claim under the Administrative Procedure Act. As relevant, Cargill alleged that ATF lacked statutory authority to promulgate the final Rule because bump stocks are not "machinegun[s]" as defined in §5845(b). After a bench trial, the District Court entered judgment for ATF. The court concluded that "a bump stock fits the statutory definition of a 'machinegun.'" *Cargill* v. *Barr*, 502 F. Supp. 3d 1163, 1194 (WD Tex. 2020).

The Court of Appeals initially affirmed, 20 F. 4th 1004 (CA5 2021), but later reversed after rehearing en banc, 57 F. 4th 447 (CA5 2023). A majority agreed, at a minimum,

that §5845(b) is ambiguous as to whether a semiautomatic
rifle equipped with a bump stock fits the statutory defini-
tion of a machinegun. And, the majority concluded that the
rule of lenity required resolving that ambiguity in Cargill's
favor. *Id.*, at 469; see also *id.*, at 450, n. An eight-judge
plurality determined that the statutory definition of "ma-
chinegun" unambiguously excludes such weapons. A semi-
automatic rifle equipped with a bump stock, the plurality
reasoned, fires only one shot "each time the trigger 'acts,'"
*id.*, at 459, and so does not fire "more than one shot . . . by
a single function of the trigger," §5845(b). The plurality
also concluded that a bump stock does not enable a semiau-
tomatic rifle to fire more than one shot "automatically" be-
cause the shooter must "maintain manual, forward pres-
sure on the barrel." *Id.*, at 463.

We granted certiorari, 601 U. S. ___ (2023), to address a
split among the Courts of Appeals regarding whether bump
stocks meet §5845(b)'s definition of "machinegun."[2] We now
affirm.

## II

Section 5845(b) defines a "machinegun" as any weapon
capable of firing "automatically more than one shot . . . by
a single function of the trigger." We hold that a semiauto-
matic rifle equipped with a bump stock is not a "ma-
chinegun" because it cannot fire more than one shot "by a
single function of the trigger." And, even if it could, it would
not do so "automatically." ATF therefore exceeded its stat-
utory authority by issuing a Rule that classifies bump
stocks as machineguns.

--------

[2] See, *e.g.*, *Hardin* v. *Bureau of Alcohol, Tobacco, Firearms and Explo-
sives*, 65 F. 4th 895 (CA6 2023); *Guedes* v. *Bureau of Alcohol, Tobacco,
Firearms and Explosives*, 45 F. 4th 306 (CADC 2022); *Aposhian* v. *Barr*,
958 F. 3d 969 (CA10 2020).

A

A semiautomatic rifle equipped with a bump stock does not fire more than one shot "by a single function of the trigger." With or without a bump stock, a shooter must release and reset the trigger between every shot. And, any subsequent shot fired after the trigger has been released and reset is the result of a separate and distinct "function of the trigger." All that a bump stock does is accelerate the rate of fire by causing these distinct "function[s]" of the trigger to occur in rapid succession.

As always, we start with the statutory text, which refers to "a single function of the trigger." The "function" of an object is "the mode of action by which it fulfils its purpose." 4 Oxford English Dictionary 602 (1933); see also American Heritage Dictionary 533 (1969) ("The natural or proper action for which a . . . mechanism . . . is fitted or employed"). And, a "trigger" is an apparatus, such as a "movable catch or lever," that "sets some force or mechanism in action." 11 Oxford English Dictionary, at 357; see also American Heritage Dictionary, at 1371 ("The lever pressed by the finger to discharge a firearm" or "[a]ny similar device used to release or activate a mechanism"); Webster's New International Dictionary 2711 (2d ed. 1934) ("A piece, as a lever, connected with a catch or detent as a means of releasing it; specif., *Firearms*, the part of a lock moved by the finger to release the cock in firing"). The phrase "function of the trigger" thus refers to the mode of action by which the trigger activates the firing mechanism. For most firearms, including the ones at issue here, the trigger is a curved metal lever. On weapons with these standard trigger mechanisms, the phrase "function of the trigger" means the physical trigger movement required to shoot the firearm.

No one disputes that a semiautomatic rifle without a bump stock is not a machinegun because it fires only one shot per "function of the trigger." That is, engaging the trig-

ger a single time will cause the firing mechanism to discharge only one shot. To understand why, it is helpful to consider the mechanics of the firing cycle for a semiautomatic rifle. Because the statutory definition is keyed to a "function of the trigger," only the trigger assembly is relevant for our purposes. Although trigger assemblies for semiautomatic rifles vary, the basic mechanics are generally the same. The following series of illustrations depicts how the trigger assembly on an AR–15 style semiautomatic rifle works.[3] In each illustration, the front of the rifle (*i.e.*, the barrel) would be pointing to the left.

We begin with an overview of the relevant components:



Figure 1.

The trigger is a simple lever that moves backward and forward. P. Sweeney, Gunsmithing the AR–15, p. 131 (2016). The square point at the top left edge of the trigger locks into a notch at the bottom of the hammer. P. Sweeney, Gunsmithing: Rifles 269 (1999). The hammer is a spring-loaded part that swings forward toward the barrel and strikes the firing pin, causing a shot to fire. *Ibid.* The disconnector is the component responsible for resetting the hammer to its

──────────
[3] These illustrations are found in the Brief for FPC Action Foundation as *Amicus Curiae* 14–15.

original position after a shot is fired. *Ibid.*

We turn next to how these components operate:



Figure 2.

When the shooter engages the trigger by moving it backward (as indicated by the arrow), the square point of the trigger pivots downward and out of the notch securing the hammer. *Ibid.* This movement releases the spring-loaded hammer, allowing it to swing forward. *Ibid.*



Figure 3.

At the top of the hammer's rotation, it strikes the firing pin, causing the weapon to fire a single shot. See *ibid.*



Figure 4.

The firearm then ejects the spent cartridge from the chamber and loads a new one in its place. D. Long, The Complete AR–15/M16 Sourcebook 206 (2001). The mechanism that performs this task swings the hammer backward at the same time. *Ibid.*



Figure 5.

As the hammer swings backward, it latches onto the disconnector. Sweeney, Gunsmithing: Rifles, at 269. This latching (circled above) prevents the hammer from swinging forward again after a new cartridge is loaded into the chamber. *Ibid.* The disconnector will hold the hammer in

that position for as long as the shooter holds the trigger back, thus preventing the firearm from firing another shot.[4] *Ibid.*



Figure 6.

Finally, when the shooter takes pressure off the trigger and allows it to move forward (as indicated by the arrow), the hammer slips off the disconnector just as the square point of the trigger rises into the notch on the hammer (circled above). *Ibid.* The trigger mechanism is thereby reset to the original position shown in Figure 1. A semiautomatic rifle must complete this cycle for each shot fired.[5]

ATF does not dispute that this complete process is what constitutes a "single function of the trigger." A shooter may fire the weapon again after the trigger has reset, but only

———————

[4] Machinegun variants of the AR–15 style rifle include an additional component known as an auto sear. The auto sear catches the hammer as it swings backwards, but will release it again once a new cartridge is loaded if the trigger is being held back. P. Sweeney, 1 The Gun Digest Book of the AR–15, p. 38 (2005). An auto sear thus permits a shooter to fire multiple shots while engaging the trigger only once. ATF has accordingly recognized that modifying a semiautomatic rifle or handgun with an auto sear converts it into a machinegun. See ATF Ruling 81–4.

[5] An animated graphic that displays the relevant movements is available at https://www.supremecourt.gov/media/images/AR-15.gif.

by engaging the trigger a second time and thereby initiating a new firing cycle. For each shot, the shooter must engage the trigger and then release the trigger to allow it to reset. Any additional shot fired after one cycle is the result of a separate and distinct "function of the trigger."

Nothing changes when a semiautomatic rifle is equipped with a bump stock. The firing cycle remains the same. Between every shot, the shooter must release pressure from the trigger and allow it to reset before reengaging the trigger for another shot. A bump stock merely reduces the amount of time that elapses between separate "functions" of the trigger. The bump stock makes it easier for the shooter to move the firearm back toward his shoulder and thereby release pressure from the trigger and reset it. And, it helps the shooter press the trigger against his finger very quickly thereafter. A bump stock does not convert a semiautomatic rifle into a machinegun any more than a shooter with a lightning-fast trigger finger does. Even with a bump stock, a semiautomatic rifle will fire only one shot for every "function of the trigger." So, a bump stock cannot qualify as a machinegun under §5845(b)'s definition.

Although ATF agrees on a semiautomatic rifle's mechanics, it nevertheless insists that a bump stock allows a semiautomatic rifle to fire multiple shots "by a single function of the trigger." ATF starts by interpreting the phrase "single function of the trigger" to mean "a single pull of the trigger and analogous motions." 83 Fed. Reg. 66553. A shooter using a bump stock, it asserts, must pull the trigger only one time to initiate a bump-firing sequence of multiple shots. *Id.*, at 66554. This initial trigger pull sets off a sequence—fire, recoil, bump, fire—that allows the weapon to continue firing "without additional physical manipulation of the trigger by the shooter." *Ibid.* According to ATF, all the shooter must do is keep his trigger finger stationary on the bump stock's ledge and maintain constant forward pressure on the front grip to continue firing. The dissent offers

similar reasoning. See *post*, at 7–9 (opinion of SOTOMAYOR, J.).

This argument rests on the mistaken premise that there is a difference between a shooter flexing his finger to pull the trigger and a shooter pushing the firearm forward to bump the trigger against his stationary finger. ATF and the dissent seek to call the shooter's initial trigger pull a "function of the trigger" while ignoring the subsequent "bumps" of the shooter's finger against the trigger before every additional shot. But, §5845(b) does not define a machinegun based on what type of human input engages the trigger—whether it be a pull, bump, or something else. Nor does it define a machinegun based on whether the shooter has assistance engaging the trigger. The statutory definition instead hinges on how many shots discharge when the shooter engages the trigger. And, as we have explained, a semiautomatic rifle will fire only one shot each time the shooter engages the trigger—with or without a bump stock.[6] *Supra*, at 7–12.

In any event, ATF's argument cannot succeed on its own terms. The final Rule defines "function of the trigger" to include not only "a single pull of the trigger" but also any "analogous motions." 83 Fed. Reg. 66553. ATF concedes that one such analogous motion that qualifies as a single function of the trigger is "sliding the rifle forward" to bump the trigger. Brief for Petitioners 22. But, if that is true, then every bump is a separate "function of the trigger," and semiautomatic rifles equipped with bump stocks are therefore not machineguns. ATF resists the natural implication

_____

[6] The dissent says that we "resis[t]" the "ordinary understanding of the term 'function of the trigger' with two technical arguments." *Post*, at 10. But, the arguments it refers to explain why, even assuming a semiautomatic rifle equipped with a bump stock could fire more than one shot by a single function of the trigger, it could not do so "automatically." See *infra*, at 14–17. Those arguments have nothing to do with our explanation of what a "single function of the trigger" means. *Ibid.*

of its reasoning, insisting that the bumping motion is a
"function of the trigger" only when it initiates, but not when
it continues, a firing sequence. But, Congress did not write
a statutory definition of "machinegun" keyed to when a fir-
ing sequence begins and ends. Section 5845(b) asks only
whether a weapon fires more than one shot "by a single
function of the trigger."

Finally, the position that ATF and the dissent endorse is
logically inconsistent. They reason that a semiautomatic
rifle equipped with a bump stock fires more than one shot
by a single function of the trigger because a shooter "need
only pull the trigger and maintain forward pressure" to "ac-
tivate continuous fire." *Post*, at 10; see also Brief for Peti-
tioners 23. If that is correct, however, then the same should
be true for a semiautomatic rifle *without* a bump stock. Af-
ter all, as the dissent and ATF themselves acknowledge, a
shooter manually bump firing a semiautomatic rifle can
achieve continuous fire by holding his trigger finger station-
ary and maintaining forward pressure with his nontrigger
hand. See *post*, at 5; 83 Fed. Reg. 66533. Yet, they agree
that a semiautomatic rifle without a bump stock "fires only
one shot each time the shooter pulls the trigger." *Post*, at
4; see also 83 Fed. Reg. 66534. Their argument is thus at
odds with itself.

We conclude that a semiautomatic rifle equipped with a
bump stock is not a "machinegun" because it does not fire
more than one shot "by a single function of the trigger."

B

A bump stock is not a "machinegun" for another reason:
Even if a semiautomatic rifle with a bump stock could fire
more than one shot "by a single function of the trigger," it
would not do so "automatically." Section 5845(b) asks
whether a weapon "shoots . . . automatically more than one
shot . . . by a single function of the trigger." The statute
thus specifies the precise action that must "automatically"

cause a weapon to fire "more than one shot"—a "single function of the trigger." If something more than a "single function of the trigger" is required to fire multiple shots, the weapon does not satisfy the statutory definition. As Judge Henderson put it, the "statutory definition of 'machinegun' does not include a firearm that shoots more than one round 'automatically' by a single pull of the trigger **AND THEN SOME**." *Guedes* v. *Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F. 3d 1, 44 (CADC 2019) (opinion concurring in part and dissenting in part).

Firing multiple shots using a semiautomatic rifle with a bump stock requires more than a single function of the trigger. A shooter must also actively maintain just the right amount of forward pressure on the rifle's front grip with his nontrigger hand. See *supra*, at 2–3. Too much forward pressure and the rifle will not slide back far enough to release and reset the trigger, preventing the rifle from firing another shot. Too little pressure and the trigger will not bump the shooter's trigger finger with sufficient force to fire another shot. Without this ongoing manual input, a semiautomatic rifle with a bump stock will not fire multiple shots. Thus, firing multiple shots requires engaging the trigger one time—and then some.[7]

ATF and the dissent counter that machineguns also require continuous manual input from a shooter: He must

_____

[7]The dissent seemingly concedes this point, repeatedly recognizing that the shooter must both pull the trigger *and* maintain forward pressure on the front grip. See, *e.g.*, *post*, at 6 ("[A] single pull of the trigger provides continuous fire as long as the shooter maintains forward pressure on the gun"); *ibid.* ("A bump-stock-equipped semiautomatic rifle is a machinegun because . . . a shooter can . . . fire continuous shots without any human input beyond maintaining forward pressure"); *post*, at 10 ("[A] shooter of a bump-stock-equipped AR–15 need only pull the trigger and maintain forward pressure"); *post*, at 13 ("After a shooter pulls the trigger, if he maintains continuous forward pressure on the gun, the bump stock harnesses the recoil to move the curved lever back and forth against his finger").

both engage the trigger and keep it pressed down to con-
tinue shooting. In their view, there is no meaningful differ-
ence between holding down the trigger of a traditional ma-
chinegun and maintaining forward pressure on the front
grip of a semiautomatic rifle with a bump stock. This argu-
ment ignores that Congress defined a machinegun by what
happens "automatically" "by a single function of the trig-
ger." Simply pressing and holding the trigger down on a
fully automatic rifle is not manual input in addition to a
trigger's function—it is what causes the trigger to function
in the first place. By contrast, pushing forward on the front
grip of a semiautomatic rifle equipped with a bump stock is
not part of functioning the trigger. After all, pushing on the
front grip will not cause the weapon to fire unless the
shooter also engages the trigger with his other hand. Thus,
while a fully automatic rifle fires multiple rounds "automat-
ically . . . by a single function of the trigger," a semiauto-
matic rifle equipped with a bump stock can achieve the
same result only by a single function of the trigger and then
some.

Moreover, a semiautomatic rifle with a bump stock is in-
distinguishable from another weapon that ATF concedes
cannot fire multiple shots "automatically": the Ithaca Model
37 shotgun. The Model 37 allows the user to "slam fire"—
that is, fire multiple shots by holding down the trigger while
operating the shotgun's pump action. Each pump ejects the
spent cartridge and loads a new one into the chamber. If
the shooter is holding down the trigger, the new cartridge
will fire as soon as it is loaded. According to ATF, the Model
37 fires more than one shot by a single function of the trig-
ger, but it does not do so "automatically" because the
shooter must manually operate the pump action with his
nontrigger hand. See 83 Fed. Reg. 66534. That logic man-
dates the same result here. Maintaining the proper amount
of forward pressure on the front grip of a bump-stock
equipped rifle is no less additional input than is operating

the pump action on the Model 37.[8]

ATF responds that a shooter is less physically involved with operating a bump-stock equipped rifle than operating the Model 37's pump action. Once the shooter pulls the rifle's trigger a single time, the bump stock "harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing." *Id.,* at 66519. But, even if one aspect of a weapon's operation could be seen as "automatic," that would not mean the weapon "shoots . . . automatically more than one shot . . . *by a single function of the trigger*." §5845(b) (emphasis added). After all, many weapons have some "automatic" features. For example, semiautomatic rifles eject the spent cartridge from the firearm's chamber and load a new one in its place without any input from the shooter. See *supra*, at 10. A semiautomatic rifle is therefore "automatic" in the general sense that it performs some operations that would otherwise need to be completed by hand. But, as all agree, a semiautomatic rifle cannot fire more than one shot "automatically . . . by a single function of the trigger" because the shooter must do more than simply engage the trigger one time. The same is true of a semiautomatic rifle equipped with a bump stock.

Thus, even if a semiautomatic rifle could fire more than one shot by a single function of the trigger, it would not do so "automatically."

## C

Abandoning the text, ATF and the dissent attempt to shore up their position by relying on the presumption

---

[8]The dissent attempts to undermine this analogy by pointing out that a Model 37 requires manual reloading and therefore cannot qualify as a machinegun under §5845(b). *Post*, at 12–13, n. 5. But, that is beside the point. As ATF itself agrees, the Model 37 is not a machinegun for another, independent reason: It cannot "automatically" fire more than one shot by a single function of the trigger. See Brief for Petitioners 38. And, as explained, the reasons why a Model 37 cannot do so apply with equal force to semiautomatic rifles equipped with bump stocks.

against ineffectiveness. That presumption weighs against interpretations of a statute that would "rende[r] the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner." *The Emily*, 9 Wheat. 381, 389 (1824). It is a modest corollary to the commonsense proposition "that Congress presumably does not enact useless laws." *United States* v. *Castleman*, 572 U. S. 157, 178 (2014) (Scalia, J., concurring in part and concurring in judgment).

In ATF's view, Congress "restricted machineguns because they eliminate the manual movements that a shooter would otherwise need to make in order to fire continuously" at a high rate of fire, as bump stocks do. Brief for Petitioners 40. So, ATF reasons, concluding that bump stocks are lawful "simply because the [trigger] moves back and forth . . . would exalt artifice above reality and enable evasion of the federal machinegun ban." *Id.*, at 41–42 (internal quotation marks omitted). The dissent endorses a similar view. See *post*, at 14–17.

The presumption against ineffectiveness cannot do the work that ATF and the dissent ask of it. A law is not useless merely because it draws a line more narrowly than one of its conceivable statutory purposes might suggest. Interpreting §5845(b) to exclude semiautomatic rifles equipped with bump stocks comes nowhere close to making it useless. Under our reading, §5845(b) still regulates all traditional machineguns. The fact that it does not capture other weapons capable of a high rate of fire plainly does not render the law useless. Moreover, it is difficult to understand how ATF can plausibly argue otherwise, given that its consistent position for almost a decade in numerous separate decisions was that §5845(b) does not capture semiautomatic rifles equipped with bump stocks. See App. 16–68. Curiously, the dissent relegates ATF's about-face to a footnote, instead pointing to its classification of other devices. See *post*, at 14–17, and n. 6.

The dissent's additional argument for applying the presumption against ineffectiveness fails on its own terms. To argue that our interpretation makes §5845(b) "far less effective," the dissent highlights that a shooter with a bump-stock-equipped rifle can achieve a rate of fire that rivals traditional machineguns. *Post*, at 16. But, the dissent elsewhere acknowledges that a shooter can do the same with an *unmodified* semiautomatic rifle using the manual bump-firing technique. See *post*, at 5. The dissent thus fails to prove that our reading makes §5845(b) "far less effective," much less ineffective (as is required to invoke the presumption). In any event, Congress could have linked the definition of "machinegun" to a weapon's rate of fire, as the dissent would prefer. But, it instead enacted a statute that turns on whether a weapon can fire more than one shot "automatically . . . by a single function of the trigger." §5845(b). And, "it is never our job to rewrite . . . statutory text under the banner of speculation about what Congress might have done." *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. 79, 89 (2017).[9]

## III

For the foregoing reasons, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

———————

[9] The dissent concludes by claiming that our interpretation of §5845(b) "renders Congress's clear intent readily evadable." *Post*, at 17. And, it highlights that "[e]very Member of the majority has previously emphasized that the best way to respect congressional intent is to adhere to the ordinary understanding of the terms Congress uses." *Ibid.* But, "[w]hen Congress takes the trouble to define the terms it uses, a court must respect its definitions as virtually conclusive. . . . This Court will not deviate from an express statutory definition merely because it varies from the term's ordinary meaning." *Department of Agriculture Rural Development Rural Housing Service* v. *Kirtz*, 601 U. S. 42, 59 (2024) (internal quotation marks and alteration omitted) (unanimous opinion).

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–976

_____

## MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* MICHAEL CARGILL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 14, 2024]

JUSTICE ALITO, concurring.

I join the opinion of the Court because there is simply no other way to read the statutory language. There can be little doubt that the Congress that enacted 26 U. S. C. §5845(b) would not have seen any material difference between a machinegun and a semiautomatic rifle equipped with a bump stock. But the statutory text is clear, and we must follow it.

The horrible shooting spree in Las Vegas in 2017 did not change the statutory text or its meaning. That event demonstrated that a semiautomatic rifle with a bump stock can have the same lethal effect as a machinegun, and it thus strengthened the case for amending §5845(b). But an event that highlights the need to amend a law does not itself change the law's meaning.

There is a simple remedy for the disparate treatment of bump stocks and machineguns. Congress can amend the law—and perhaps would have done so already if ATF had stuck with its earlier interpretation. Now that the situation is clear, Congress can act.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–976

_____

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., PETITIONERS _v._ MICHAEL CARGILL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 14, 2024]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

On October 1, 2017, a shooter opened fire from a hotel room overlooking an outdoor concert in Las Vegas, Nevada, in what would become the deadliest mass shooting in U. S. history. Within a matter of minutes, using several hundred rounds of ammunition, the shooter killed 58 people and wounded over 500. He did so by affixing bump stocks to commonly available, semiautomatic rifles. These simple devices harness a rifle's recoil energy to slide the rifle back and forth and repeatedly "bump" the shooter's stationary trigger finger, creating rapid fire. All the shooter had to do was pull the trigger and press the gun forward. The bump stock did the rest.

Congress has sharply restricted civilian ownership of machineguns since 1934. Federal law defines a "machinegun" as a weapon that can shoot "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U. S. C. §5845(b). Shortly after the Las Vegas massacre, the Trump administration, with widespread bipartisan support, banned bump stocks as machineguns under the statute.

Today, the Court puts bump stocks back in civilian hands. To do so, it casts aside Congress's definition of "machinegun" and seizes upon one that is inconsistent with the

ordinary meaning of the statutory text and unsupported by context or purpose. When I see a bird that walks like a duck, swims like a duck, and quacks like a duck, I call that bird a duck. A bump-stock-equipped semiautomatic rifle fires "automatically more than one shot, without manual reloading, by a single function of the trigger." §5845(b). Because I, like Congress, call that a machinegun, I respectfully dissent.

## I
## A

Machineguns were originally developed in the 19th century as weapons of war. See J. Ellis, The Social History of the Machine Gun 21–45 (1986) (Ellis). Smaller and lighter submachine guns were not commercially available until the 1920s. See Brief for Patrick J. Charles as *Amicus Curiae* 5 (Charles Brief). Although these weapons were originally marketed to law enforcement, they inevitably made it into the hands of gangsters. See *id.*, at 8–9; Ellis 149–165. Gangsters like Al Capone used machineguns to rob banks, ambush the police, and murder rivals. See Ellis 153–154, 157–158. Newspaper headlines across the country flashed "'Gangsters Use Machine Guns,'" "'Machine Gun Used in Bank Hold-Up,'" and "'Machine Gun Thugs Kill Postal Employee.'" Charles Brief 9.

Congress responded in 1934 by sharply restricting civilian ownership of machineguns. See National Firearms Act of 1934, §§3–6, 48 Stat. 1236, 1237–1238. The Senate Report explaining the 1934 Act emphasized that the "gangster as a law violator must be deprived of his most dangerous weapon, the machine gun." S. Rep. No. 1444, 73d Cong., 2d Sess., 1–2. "[W]hile there is justification for permitting the citizen to keep a pistol or revolver for his own protection . . . , there is no reason why anyone except a law officer should have a machine gun." *Id.*, at 2.

These early machineguns allowed a shooter to fire in a

variety of ways. Some would fire continuously with a single pull of the trigger or push of a button. See Charles Brief 7, and n. 12 (noting that a Browning M1918 rifle fired eight rounds "'in a second with one pull of the trigger'"); see also Brief for Petitioners 22 (noting that a Browning M2 fired with a push of the thumb). Others, such as the famous Thompson Submachine Gun Caliber .45, or "Tommy Gun," would fire continuously only so long as the shooter maintained backward pressure on the trigger; a shooter could still fire single shots by pulling and releasing the trigger each time. See Test of Thompson Submachine Gun, 69 Army and Navy Register 355 (Apr. 9, 1921) (noting that the shooter of a Tommy Gun "can fire the contents of the magazine with a single prolonged pull or fire a single shot by merely releasing the trigger"). The internal mechanisms of automatic-fire weapons also varied enormously, with many (such as the Tommy Gun) relying principally on the recoil energy produced by each bullet's discharge to effectuate automatic fire. See, *e.g.*, War Dept., Basic Field Manual: Thompson Submachine Gun, Caliber .45, M1928A1, p. 1 (1941) ("The Thompson submachine gun . . . is an air-cooled, recoil-operated, magazine-fed weapon"); W. Smith, Small Arms of the World: The Basic Manual of Military Small Arms 165 (1955) (describing Tommy guns as "recoil operated weapons on the elementary blowback principle").

To account for these differences, Congress adopted a definition of "machinegun" that captured "any weapon which shoots, or is designed to shoot, automatically . . . more than one shot, without manual reloading, by a single function of the trigger." National Firearms Act, 48 Stat. 1236. That essential definition still governs today. See 26 U. S. C. §5845(b).[1]

--------

[1] Congress has twice strengthened the regulation of machineguns over the years without substantially updating the definition. See Gun Control Act of 1968, 82 Stat. 1213 (expanding registration requirements and strengthening criminal penalties); Firearms Owners' Protection Act, 100

B

The archetypal modern "machinegun" is the military's standard-issue M16 assault rifle. With an M16 in automatic mode, the shooter pulls the trigger once to achieve a fire rate of 700 to 950 rounds per minute. See Dept. of Defense, Defense Logistics Agency, Small Arms, https://www. dla.mil/Disposition-Services/Offers/Law-Enforcement/ Weapons/. An internal mechanism automates the M16's continuous fire, so that all the shooter has to do is keep backward pressure on the trigger. See Brief for Giffords Law Center to Prevent Gun Violence et al. as *Amici Curiae* 9–11 (Giffords Brief) (discussing internal firing mechanism of M16). If the shooter stops putting pressure on the trigger, the gun stops firing.

Semiautomatic weapons are not "machineguns" under the statute. Take, for instance, an AR–15-style semiautomatic assault rifle. To rapidly fire an AR–15, a shooter must rapidly pull the trigger himself. It is "semi" automatic because, although the rifle automatically loads a new cartridge into the chamber after it is fired, it fires only one shot each time the shooter pulls the trigger. See 18 U. S. C. §921(a)(29) (2018 ed., Supp. IV).

To fire an M16 or AR–15 rifle, a person typically holds the "grip" next to the trigger with his firing hand. He stabilizes the weapon with his other hand on its barrel or "front grip." He then raises the weapon so that the butt, or "stock," of the gun rests against his shoulder, lines up the sights to look down the gun, and squeezes the trigger. See Dept. of the Army, Field Manual 23–9, Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine, Ch. 4, Section III, p. 4-22 (Sept. 13, 2006) (M16 Field Manual). A regular person with an AR–15 can achieve a fire rate of around 60 rounds per minute, with one pull of the trigger per second.

_____

Stat. 452–453 (making it a federal crime "'to transfer or possess a machinegun'").

Tr. of Oral Arg. 39. A professional sport shooter can use the AR–15 to fire at a rate of up to 180 rounds per minute, pulling the trigger three times per second. Giffords Brief 14.

A shooter can also manually "bump" an AR–15 to increase the rate of fire by using a belt loop or rubber band to hold his trigger finger in place and harness the recoil from the first shot to fire the rifle continuously. See 83 Fed. Reg. 66532–66533 (2018). To use a belt loop, he must hold the rifle low against his hip, put his finger in the trigger guard, and then loop his finger through a belt loop on his pants to lock the finger in place. See *id.*, at 66533. With his other hand, he then pushes the rifle forward until his stationary finger engages the trigger to fire the first shot. See *ibid.* The recoil from that shot pushes the rifle violently backward. See *ibid.* If the shooter keeps pressing the rifle forward against the finger in his belt loop, the repeated backward jump of the recoil combined with his forward pressure allows the rifle to fire continuously. See *ibid.* A shooter using this method, however, cannot shoot very precisely. He has neither the advantage of the sights to line up his shot, nor his shoulder to stabilize the recoil. A shooter can also use a rubber band or zip tie to tie a finger close to the trigger. See *id.*, at 66532. If the shooter is strong and skilled enough physically to control the distance and direction of the rifle's significant recoil, the rifle will fire continuously.

A bump stock automates and stabilizes the bump firing process. It replaces a rifle's standard stock, which is the part held against the shoulder. See *id.*, at 66516. A bump stock, unlike a standard stock, allows the rifle's upper assembly to slide back and forth in the stock. See *ibid.* It also typically includes a finger rest on which the shooter can place his finger while shooting, and a "receiver module" that guides and regulates the weapon's recoil. *Ibid.* To fire a semiautomatic rifle equipped with a bump stock, the shooter either pulls the trigger, see *ibid.*, or slides the gun

forward in the bump stock, which presses the trigger into
his trigger finger, *Cargill* v. *Barr*, 502 F. Supp. 3d 1163,
1175 (WD Tex. 2020). As long as the shooter keeps his trig-
ger finger on the finger rest and maintains constant for-
ward pressure on the rifle's barrel or front grip, the weapon
will fire continuously. See 83 Fed. Reg. 66516. A rifle
equipped with a bump stock can fire at a rate between 400
and 800 rounds per minute. Tr. of Oral Arg. 40.

## II

A machinegun does not fire itself. The important ques-
tion under the statute is how a person can fire it. A weapon
is a "machinegun" when a shooter can (1) "by a single func-
tion of the trigger," (2) shoot "automatically more than one
shot, without manually reloading." 26 U. S. C. §5845(b).
The plain language of that definition refers most obviously
to a rifle like an M16, where a single pull of the trigger pro-
vides continuous fire as long as the shooter maintains back-
ward pressure on the trigger. The definition of "ma-
chinegun" also includes "any part designed and intended
. . . for use in converting a weapon into a machinegun."
*Ibid.* That language naturally covers devices like bump
stocks, which "conver[t]" semiautomatic rifles so that a sin-
gle pull of the trigger provides continuous fire as long as the
shooter maintains forward pressure on the gun.

This is not a hard case. All of the textual evidence points
to the same interpretation. A bump-stock-equipped semi-
automatic rifle is a machinegun because (1) with a single
pull of the trigger, a shooter can (2) fire continuous shots
without any human input beyond maintaining forward
pressure. The majority looks to the internal mechanism
that initiates fire, rather than the human act of the
shooter's initial pull, to hold that a "single function of the
trigger" means a reset of the trigger mechanism. Its inter-
pretation requires six diagrams and an animation to deci-
pher the meaning of the statutory text. See *ante,* at 8–11,

and n. 5. Then, shifting focus from the internal mechanism of the gun to the perspective of the shooter, the majority holds that continuous forward pressure is too much human input for bump-stock-enabled continuous fire to be "automatic." See *ante,* at 14–17.

The majority's reading flies in the face of this Court's standard tools of statutory interpretation. By casting aside the statute's ordinary meaning both at the time of its enactment and today, the majority eviscerates Congress's regulation of machineguns and enables gun users and manufacturers to circumvent federal law.

## A

Start with the phrase "single function of the trigger." All the tools of statutory interpretation, including dictionary definitions, evidence of contemporaneous usage, and this Court's prior interpretation, point to that phrase meaning the initiation of the firing sequence by an act of the shooter, whether via a pull, push, or switch of the firing mechanism. The majority nevertheless interprets "function of the trigger" as "the mode of action by which the trigger activates the firing mechanism." *Ante,* at 7. Because in a bump-stock-equipped semiautomatic rifle, the trigger's internal mechanism must reset each time a weapon fires, the majority reads each reset as a new "function." That reading fixates on a firearm's internal mechanics while ignoring the human act on the trigger referenced by the statute.

Consider the relevant dictionary definitions. In 1934, when Congress passed the National Firearms Act, "function" meant "the mode of action by which [something] fulfils its purpose." 4 Oxford English Dictionary 602 (1933). A "trigger" meant the "movable catch or lever" that "sets some force or mechanism in action." 11 *id.*, at 357. The majority agrees with those definitions. *Ante,* at 7. It errs, however, by maintaining a myopic focus on a trigger's mechanics rather than on how a shooter uses a trigger to initiate fire.

*Ibid.*

Nothing about those definitions suggests that "function of the trigger" means the mechanism by which the trigger resets mechanically to fire a second shot. See *ante*, at 8–11 (explaining the interior mechanics of an AR–15 trigger mechanism), as opposed to the process that a pull of the trigger on a bump-stock-equipped semiautomatic rifle sets in motion. The most important "function" of a "trigger" is what it enables a shooter to do; what "force or mechanism" it sets "in action." 11 Oxford English Dictionary, at 357. A "single function of the trigger" more naturally means a single initiation of the firing sequence. Regardless of what is happening in the internal mechanics of a firearm, if a shooter must activate the trigger only a single time to initiate a firing sequence that will shoot "automatically more than one shot," that firearm is a "machinegun." §5845(b).

Evidence of contemporaneous usage overwhelmingly supports that interpretation. The term "'function of the trigger'" was proposed by the president of the National Rifle Association (NRA) during a hearing on the National Firearms Act before the House. See National Firearms Act: Hearings on H. R. 9066 before the House Committee on Ways and Means, 73d Cong., 2d Sess., 38–40 (1934). He understood the "distinguishing feature of a machine gun [to be] that by a single pull of the trigger the gun continues to fire." *Id.*, at 40. He emphasized that a firearm "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded . . . as a machine gun." *Ibid.* Distinguishing a machinegun from a pistol, the NRA president emphasized that for a pistol "[y]ou must release the trigger and pull it again for the second shot to be fired." *Id.*, at 41. He did not say "the hammer slips off the disconnector just as the square point of the trigger rises into the notch on the hammer . . . thereby reset[ting the trigger mechanism] to the original position." *Ante,* at 11. He instead emphasized the action of

the shooter, who must repeatedly activate the trigger for each shot. Predictably, the House and Senate Reports reflect the same understanding of the phrase. See H. R. Rep. No. 1780, 73d Cong., 2d Sess., 2 (1934) (reporting that the statute "contains the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger"); S. Rep. No. 1444, 73d Cong., 2d Sess., 2 (1934) (same).

The majority cannot disregard these statements as evidence of legislative purpose.[2] They are, along with contemporaneous dictionary definitions, some of the best evidence of contemporaneous understanding. Cf. *McDonald* v. *Chicago*, 561 U. S. 742, 828 (2010) (THOMAS, J., concurring in part and concurring in judgment) ("Statements by legislators can assist . . . to the extent they demonstrate the manner in which the public used or understood a particular word or phrase"). Indeed, at oral argument, when asked what evidence there was "that as of 1934, the ordinary understanding of the phrase 'function of the trigger' referred to the mechanics of the gun rather than . . . the shooter's motion," respondent's lawyer could not point to a single piece of evidence that supports the majority's reading. Tr. of Oral Arg. 98; see *id.*, at 98–101. He even agreed that Congress used the word "function" to ensure that the statute covered a wide variety of trigger mechanisms, including both push and pull triggers. *Id.*, at 101–102. In short, the majority disregards the unrefuted evidence of the text's ordinary and contemporaneous meaning, substituting instead its own understanding of the internal mechanics of an AR–15 without looking at the actions of the shooter.

This Court itself has also previously read the definition of "machinegun" in this exact statute to refer to the action

──────────

[2] Of course, "authoritative legislative history can be useful, even when the meaning can be discerned from the statute's language, to reinforce or to confirm a court's sense of the text." R. Katzmann, Judging Statutes 35 (2014).

of the shooter rather than the firing mechanism.  In *Staples*
v. *United States*, 511 U. S. 600 (1994), the Court noted that
"a weapon that fires repeatedly with a *single pull of the trig-*
*ger*" is a machinegun, as opposed to "a weapon that fires
only one shot with each pull of the trigger," which is (at
most) a semiautomatic firearm.  *Id.*, at 602, n. 1 (emphasis
added).  A "pull" of the trigger necessarily requires human
input.

When a shooter initiates the firing sequence on a bump-
stock-equipped semiautomatic rifle, he does so with "a sin-
gle function of the trigger" under that term's ordinary
meaning.  Just as the shooter of an M16 need only pull the
trigger and maintain backward pressure (on the trigger), a
shooter of a bump-stock-equipped AR–15 need only pull the
trigger and maintain forward pressure (on the gun).  Both
shooters pull the trigger only once to fire multiple shots.
The only difference is that for an M16, the shooter's back-
ward pressure makes the rifle fire continuously because of
an internal mechanism: The curved lever of the trigger does
not move.  In a bump-stock-equipped AR–15, the mecha-
nism for continuous fire is external: The shooter's forward
pressure moves the curved lever back and forth against his
stationary trigger finger.  Both rifles require only one initial
action (that is, one "single function of the trigger") from the
shooter combined with continuous pressure to activate con-
tinuous fire.[3]

The majority resists this ordinary understanding of the
term "function of the trigger" with two technical argu-
ments.[4]  First, it attempts to contrast the action required to

_____

[3] The majority thinks that this logic should apply just as well to man-
ual bump firing.  *Ante,* at 14.  As described *supra*, at 5, and *infra*, at 13,
however, bump firing requires much more from the shooter than the sim-
ple forward pressure required to fire a bump-stock-equipped semiauto-
matic rifle.

[4] The majority claims that these arguments explain only "why, even
assuming a semiautomatic rifle equipped with a bump stock could fire

fire an M16 from that required to fire a bump-stock-equipped AR–15. The majority argues that "holding the trigger down on a fully automatic rifle is not manual input in addition to a trigger's function—it is what causes the trigger to function in the first place" whereas "pushing on the front grip [of a bump-stock equipped semiautomatic rifle] will not cause the weapon to fire unless the shooter also engages the trigger with his other hand." *Ante,* at 16. The shooter of a bump-stock-equipped AR–15, however, need not "pull" the trigger to fire. Instead, he need only place a finger on the finger rest and push forward on the front grip or barrel with his other hand. Instead of pulling the trigger, the forward motion pushes the bump stock into his finger.

Second, the majority tries to cabin "single function of the trigger" to a single mechanism for activating continuous fire. See *ante,* at 14–15. A shooter can fire a bump-stock-equipped semiautomatic rifle in two ways. First, he can choose to fire single shots via distinct pulls of the trigger without exerting any additional pressure. Second, he can fire continuously via maintaining constant forward pressure on the barrel or front grip. The majority holds that the forward pressure cannot constitute a "single function of the trigger" because a shooter can also fire single shots by pulling the trigger. That logic, however, would also exclude a Tommy Gun and an M16, the paradigmatic examples of regulated machineguns in 1934 and today. Both weapons can fire either automatically or semiautomatically. A shooter using a Tommy Gun in automatic mode could

—————

more than one shot by a single function of the trigger, it could not do so 'automatically.'" *Ante,* at 13, n. 6. That is correct, as far as the majority's reasoning goes. The majority defines "'single function of the trigger'" as a reset of a rifle's internal trigger mechanism. *Ante,* at 11. A more accurate definition is the human action required to initiate the firing sequence. *Supra,* at 7–10. The majority's argument for why "something more than a 'single function of the trigger' is required to fire multiple shots," *ante,* at 15, is therefore relevant to both its discussion of "automatically" and my discussion of "single function of the trigger."

choose to fire single shots with distinct pulls of the trigger, or continuous shots by maintaining constant backward pressure on the trigger. See *supra*, at 3. An M16 user can toggle the weapon from semiautomatic mode, which allows only one shot per pull of the trigger, to automatic mode, which enables continuous fire. See M16 Field Manual, Section III, p. 4-8. In 1934 as now, there is no commonsense difference between a firearm where a shooter must hold down a trigger or flip a switch to initiate rapid fire and one where a shooter must push on the front grip or barrel to do the same.

The majority's logic simply does not overcome the overwhelming textual and contextual evidence that "single function of the trigger" means a single action by the shooter to initiate a firing sequence, including pulling a trigger and pushing forward on a bump-stock-equipped semiautomatic rifle.

B

Next, consider what makes a machinegun "automatic." A bump-stock-equipped semiautomatic rifle is a "machinegun" because with a "single function of the trigger" it "shoot[s], automatically more than one shot, without manual reloading." §5845(b). Put simply, the bump stock automates the process of firing more than one shot.

Before automatic weapons, a person who wanted to fire multiple shots from a firearm had to do two things after pulling the trigger the first time: (1) he had to reload the gun; and (2) he had to pull the trigger again. A semiautomatic weapon like an AR–15 already automates the first process. The bump stock automates the second.[5] In a fully

_____

[5] The majority attempts to analogize a bump stock to the Model 37 shotgun, which allows the user to "fire multiple shots by holding down the trigger while operating the shotgun's pump action." *Ante,* at 16. The Model 37 automates the second process (*i.e.*, pulling the trigger for each shot), as long as the shooter maintains pressure on the trigger. Unlike a

automatic rifle like an M16, that automation is internal. After a shooter pulls the trigger, if he maintains continuous backward pressure on the trigger, the curved lever itself will not move. Instead, an internal mechanism allows continuous fire. On a bump-stock-equipped semiautomatic rifle, the automation is external. After a shooter pulls the trigger, if he maintains continuous forward pressure on the gun, the bump stock harnesses the recoil to move the curved lever back and forth against his finger. That external automated motion creates continuous fire.

When a shooter "bump" fires a semiautomatic weapon without a bump stock, he must control several things using his own strength and skill: (1) the backward recoil of each shot, including both the direction in which the rifle moves and how far it moves when recoiling; (2) the trigger finger, by maintaining a stationary position with a loose enough hold on the trigger that the rapidly moving gun will hit his finger each time; and (3) the forward motion of the rifle after it recoils backward. A bump stock automates those processes. The replacement stock controls the direction and distance of the recoil, and the finger rest obviates the need to maintain a stationary finger position. All a shooter must do is rest his finger and press forward on the front grip or barrel for the rifle to fire continuously.

The majority nevertheless concludes that a bump-stock-equipped semiautomatic rifle requires too much human input to fire "automatic[ally]" because it requires the "proper amount of forward pressure on the front grip" to maintain continuous fire. *Ante,* at 16. "Automati[c]," however, does not mean zero human input. An M16 requires the shooter to exert the "proper amount of [backward] pressure on the"

_____

semiautomatic rifle, however, the Model 37 does not automate the first, as the shooter "must manually operate the pump action with his nontrigger hand" to "ejec[t] the spent cartridge and loa[d] a new one into the chamber." *Ibid.*

trigger to maintain continuous fire. *Ibid.* So, too, a machinegun that requires a user to hold down a button. Makers of automatic weapons may require continuous human input for safety purposes; an accidental trigger pull that activates rapid fire is less harmful if it does not require affirmative human action to stop. Requiring continuous pressure for continuous fire, however, does not prevent a firearm from "shoot[ing], automatically more than one shot." §5845(b).

### C

This Court has repeatedly avoided interpretations of a statute that would facilitate its ready "evasion" or "enable offenders to elude its provisions in the most easy manner." *The Emily*, 9 Wheat. 381, 389–390 (1824); see also *Abramski* v. *United States*, 573 U. S. 169, 181–182, 185 (2014) (declining to read a gun statute in a way that would permit ready "evasion," "defeat the point" of the law, or "easily bypass the scheme"). Justice Scalia called this interpretive principle the "presumption against ineffectiveness." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012). The majority arrogates Congress's policymaking role to itself by allowing bumpstock users to circumvent Congress's ban on weapons that shoot rapidly via a single action of the shooter.

"The presumption against ineffectiveness ensures that a text's manifest purpose is furthered, not hindered." *Ibid.* Before machineguns, a shooter could fire a gun only as fast as his finger could pull the trigger. Congress sought to restrict the civilian use of machineguns because they eliminated the need for a person rapidly to pull the trigger himself to fire continuously. A bump stock serves that function. Even a skilled sport shooter can fire an AR–15 at a rate of only 180 rounds per minute by rapidly pulling the trigger. Anyone shooting a bump-stock-equipped AR–15 can fire at a rate between 400 and 800 rounds per minute with a single

pull of the trigger.

Moreover, bump stocks are not the only devices that transform semiautomatic rifles into weapons capable of rapid fire with a single function of the trigger. Recognizing the creativity of gun owners and manufacturers, Congress wrote a statute "loaded with anticircumvention devices." Tr. of Oral Arg. 68. The definition of "machinegun" captures "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." §5845(b). Not "more than four, five, or six shots," not "single pull" or "single push" of the trigger. Following that definition, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has reasonably classified many transformative devices other than bump stocks as "machinegun[s]."[6] For instance, ATF has long classified "forced reset triggers" as machineguns. See Brief for Petitioners 28. A forced reset trigger includes a device that forces the trigger back downward after the shooter's initial pull, repeatedly pushing the curved lever against the shooter's stationary trigger finger. See *ibid.* To a shooter, a semiautomatic rifle equipped with a forced reset trigger feels much like an M16. He must pull the trigger only once and then maintain pressure to achieve continuous fire. See *ibid.*

Gun owners themselves also have built motorized devices that will repeatedly pull a semiautomatic firearm's curved

———————

[6] The majority emphasizes that ATF previously took the position that certain bump-stock devices were not "machinegun[s]" under the statute. See *ante,* at 3, 19. ATF, however, has repeatedly classified other devices that modify semiautomatic rifles by allowing a single activation of the shooter to automate repeat fire as machineguns. See, *e.g.*, 83 Fed. Reg. 66518, n. 4 (referencing ATF classifications of trigger reset devices); *Akins* v. *United States*, 312 F. Appx. 197, 200–201 (CA11 2009) (*per curiam*) (upholding classification of Akins Accelerator, a spring-operated bump stock); *United States* v. *Camp*, 343 F. 3d 743, 745 (CA5 2003) (upholding classification of fishing reel attached to a rifle trigger that, upon activation, repeatedly operated the curved lever of the rifle).

lever to enable continuous fire. ATF has classified such de-
vices as "machinegun[s]" since 1982. See Record 1077. In
2003, the Fifth Circuit held that such a contraption quali-
fied as a "machinegun" under the statute. See *United
States* v. *Camp*, 343 F. 3d 743, 745. An owner of a semiau-
tomatic rifle had placed a fishing reel inside the weapon's
trigger guard. *Id.*, at 744. When he pulled a switch behind
the original trigger, the switch supplied power to a motor
connected to the fishing reel. *Ibid.* The motor caused the
reel to rotate, and that rotation manipulated the curved
lever, causing it to fire in rapid succession. *Ibid.* ATF in
2017 also classified as a "machinegun" a wearable glove
that a shooter could activate to initiate a mechanized piston
moving back and forth, repeatedly pulling and releasing a
semiautomatic rifle's curved lever. See Record 1074–1076.[7]

The majority tosses aside the presumption against inef-
fectiveness, claiming that its interpretation only "draws a
line more narrowly than one of [Congress's] conceivable
statutory purposes might suggest" because the statute still
regulates "all traditional machineguns" like M16s. *Ante,* at
18. Congress's ban on M16s, however, is far less effective if
a shooter can instead purchase a bump stock or construct a
device that enables his AR–15 to fire at the same rate. Even
bump-stock manufacturers recognize that they are exploit-
ing a loophole, with one bragging on its website "Bumpfire
Stocks are the closest you can get to full auto and still
be legal." Midsouth Shooters, BUMPFIRE SYSTEMS,
https://www.midsouthshooterssupply.com/b/bumpfire-

--------

[7] Respondent does not today challenge ATF's classification of these de-
vices as "machinegun[s]." His lawyer noted at oral argument, however,
that "forced reset triggers" would be part of a category of "harder cases"
where "there may be a question as to what exactly the trigger is and then
how does that trigger function." Tr. of Oral Arg. 82. That ambiguity
stems from the majority's loophole for weapons that require multiple me-
chanical actions to fire continuously, even when a shooter initiates that
fire with a single human action.

systems. The majority creates a definition of the statute that bans only "traditional" machineguns, even though its definition renders Congress's clear intent readily evadable.

Every Member of the majority has previously emphasized that the best way to respect congressional intent is to adhere to the ordinary understanding of the terms Congress uses. See, *e.g.*, *Jam* v. *International Finance Corp.*, 586 U. S. 199, 209 (2019) (ROBERTS, C. J., for the Court) ("'[T]he legislative purpose is expressed by the ordinary meaning of the words used'"); *Gross* v. *FBL Financial Services, Inc.*, 557 U. S. 167, 175 (2009) (THOMAS, J., for the Court) ("'Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose'"); *Wall* v. *Kholi*, 562 U. S. 545, 551 (2011) (ALITO, J., for the Court) ("'We give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import'"); *BP p.l.c.* v. *Mayor and City Council of Baltimore*, 593 U. S. 230, 237 (2021) (GORSUCH, J., for the Court) ("When called on to interpret a statute, this Court generally seeks to discern and apply the ordinary meaning of its terms at the time of their adoption"); *Sackett* v. *EPA*, 598 U. S. 651, 723, 727 (2023) (KAVANAUGH, J., concurring in judgment) (reasoning that departing from "all indications of ordinary meaning" will "create regulatory uncertainty for the Federal Government . . . and regulated parties"); *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 77, 83 (2023) (BARRETT, J., for the Court) (declining to "artificially narrow ordinary meaning" to "second-guess [Congress's] judgment"). Today, the majority forgets that principle and substitutes its own view of what constitutes a "machinegun" for Congress's.

\* \* \*

Congress's definition of "machinegun" encompasses bump stocks just as naturally as M16s. Just like a person

can shoot "automatically more than one shot" with an M16 through a "single function of the trigger" if he maintains continuous backward pressure on the trigger, he can do the same with a bump-stock-equipped semiautomatic rifle if he maintains forward pressure on the gun. §5845(b). Today's decision to reject that ordinary understanding will have deadly consequences. The majority's artificially narrow definition hamstrings the Government's efforts to keep machineguns from gunmen like the Las Vegas shooter. I respectfully dissent.